[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Jonathan Banquer has filed this lawsuit against the defendant Catherine J. Steidley alleging that she made fraudulent misrepresentations to a third person, causing injury to the plaintiff. The plaintiff claims money damages.
The plaintiff and the defendant became acquainted when she answered a "personal" ad he had placed in a publication. After a brief period of dating, the plaintiff moved into the home of the defendant on November 18, 1993. When he arrived at the defendant's residence, he paid her $2400 in consideration of his living there. For a part of this time they shared an intimate relationship.
The plaintiff had previously lived at a residence that he owned in Orange, Connecticut, which had been foreclosed. His unhappy financial situation had also caused him to file a petition in bankruptcy earlier that year, on August 5, 1993. When he was forced to move from the Orange residence he moved many items of personal property into the basement and garage of the defendant's home. For example he moved a water heater, a refrigerator/freezer, and a power washer. He also stored on her property a used Jaguar automobile on which he practiced auto body restoration skills that he was in the process of learning. Significantly, although each of these items was acquired by the plaintiff prior to filing the petition in bankruptcy, none of these items of personal property is listed in any of the schedules to the plaintiff's Chapter 7 filing, schedules to which he swore to the truth on September 20, 1993.
It is between the date of filing his petition — August 5 — and November 18, 1993, that the plaintiff claims that he spent over $23,000 acquiring tools that he intended to use for an auto body repair business that he believes would have generated substantial income for him. He had not previously been engaged in such a business, but was then going to school and doing "side jobs" in an effort to become skillful in CT Page 13666 this new trade. It is the loss of these tools and the trouble that that loss has caused him that is the crux of the plaintiff's case.
The plaintiff's father testified he and the plaintiff's mother gave the plaintiff $29,000 over a period of one year but could not remember when that was. For some of that time the plaintiff was still living in Orange, according to the elder Mr. Banquer. If that testimony is believed by the court, it means that these funds were either delivered to the plaintiff during one of the following windows: 1) beginning in November of 1992 and ending in November 1993 when the plaintiff moved from Orange, in which case some of them were required to be listed on the bankruptcy schedules; 2) beginning at the end of the plaintiff's residence in Orange and continuing for another year, in which case some of the funds were delivered to him after November 1993 when he claims all of the tools had already been purchased and stored; or 3) of course somewhere in between. In none of these scenarios does it appear likely that all the funds were delivered to the plaintiff during the three month period between August 5, 1993 and November 18, 1993, the period during which the plaintiff testified that he purchased all of the items. But more about damages later.
On January 20, 1994, the plaintiff was arrested at the home of the defendant on her complaint of domestic violence. As part of the disposition of that case, the plaintiff was placed under a court order obligating him to vacate the premises. The order allowed the plaintiff to retrieve his personal items provided he had no contact with Ms. Steidley and provided he be accompanied by a police officer at the time of the retrieval. The plaintiff took no steps at that time to deal with the removal of the tools stored at the home of the defendant.
On April 13, 1994, the court order was modified at the request of the plaintiff's attorney to specify that the plaintiff be allowed to retrieve his social security card, his birth certificate, and his motorcycle[1]
from the defendant's residence. In fact, it appears that such a modification of the order was largely unnecessary because the plaintiff already had an order allowing him to retrieve his belongings and the defendant was content and even eager to have the plaintiff remove all of his items from her premises.
The plaintiff through his counsel arranged a time for the plaintiff to arrive at the defendant's home on April 23, 1994, to retrieve his personal items. On that date, which was a sunny, dry Spring day, the defendant left her basement door unlocked and her garage door open, placed many of the items that were in boxes or bags outside, and left her friend Marge in her stead as a witness to the plaintiff's actions. The plaintiff arrived with his lawyer, a friend, a police officer, and a CT Page 13667 U-Haul truck.
Presumably in such a situation, with a criminal charge pending, a history of financial reversals, a shattered domestic relationship, and all of one's worldly possessions in the hands of one's adversary, one might be expected to order one's priorities and remove, while one had the chance, all of one's stuff, or if not all, then first those items 1) that were needed to carry on one's business or schooling, and 2) that had the greatest monetary value. But the plaintiff arrived with a truck that was not big enough to take everything. Moreover, he had not arranged for anyplace to store most of the belongings. So he took his motorcycle and its accouterments, a file folder of personal papers, some containers of clothing, some boxes of tools, and some lawn furniture, including a chaise and two chairs. He took none of the tools for which he claims he recently paid $23,000, and none of the books and manuals that he claims were necessary for him to set up his auto body business. He and his lawyer placed the other outside items (for which there was no room in the truck) back inside, and departed, leaving everything else.
The plaintiff's lawyer, in the plaintiff's presence, also took a number of photographs of the scene in the event later documentation was necessary. None of these photographs, which were admitted in evidence, depict any of the tools the plaintiff claims are so valuable to him. The photos depict dozens of boxes which the plaintiff's lawyer testified contained some tools, which a later witness Richard Belford testified contained smaller boxes of automobile parts, and which the plaintiff testified contained nothing of particular value. The photos also depict one large rolling bin and a tool cabinet with many drawers, but none of the contents of either.
The plaintiff's lawyer then sought and obtained a court order in the criminal case which purported to enjoin Ms. Steidley from damaging, destroying, removing, or otherwise disposing of the plaintiff's remaining property at her premises. Interestingly the motion, dated April 26, 1994, does not disclose that the plaintiff had been on the property on April 23, 1994 to remove his belongings. More importantly the evidence does not support the inference that Ms. Steidley ever knew that such an order was granted.[2]
There the matter seems to have sat until August of 1994 when plaintiff's lawyer contacted the defendant through her counsel to arrange for a final removal of all of the plaintiff's personal belongings. By that time Ms. Steidley had mentioned to her lawyer that the plaintiff had filed a petition in bankruptcy at some point before he began storing stuff at her house. When her lawyer learned that the plaintiff was at last intending to retrieve the personal items, her lawyer recommended CT Page 13668 that the trustee of the plaintiff's bankruptcy estate, Richard Belford, be notified. The defendant authorized her attorney to notify Mr. Belford.
Richard Belford the trustee testified that he had one or two telephone calls with the defendant and her lawyer and that there was written correspondence with her counsel. Mr. Belford determined that it was likely that the property was part of the bankrupt's estate and decided to take possession of it for safekeeping pending further proceedings in the bankruptcy court.
Mr. Belford arranged for the property to be moved to a warehouse. Mr. Belford then instituted an adversary proceeding in the bankruptcy court seeking to open the bankruptcy, which had already terminated in a discharge, and have the court declare that the items were indeed part of the estate subject to the claims of creditors. After several years of legal wrangling, the trustee decided not to further prosecute such a claim and the adversary proceeding was dismissed. Mr. Belford testified that he abandoned the claim to the property because the value of the property was less than the combined cost of storage and legal expenses connected with pursuing the litigation in the bankruptcy court. The plaintiff has still not recovered his personal property, however, because of the existence of a warehouseman's lien which the plaintiff says he cannot afford to pay.
The central question related to the plaintiff's claims in this case is how the trustee came to formulate the initial opinion that the goods were part of the bankrupt's estate and not goods to which the plaintiff was entitled. The plaintiff argues that such a view could only have been formulated if the defendant or her counsel told the trustee that Mr. Banquer acquired the goods prior to filing the petition, thus making them part of the bankrupt's estate by operation of law. The plaintiff asserts that such a statement, if made, would have been a statement of a material fact that was false and that the defendant knew was false (or that she made anyway in reckless disregard of whether it was true) intending that a third person rely on such a statement and take action that would harm the plaintiff. These, claims the plaintiff, are the elements of fraudulent misrepresentation.
The plaintiff cites no case in Connecticut that holds that such a fraudulent misrepresentation is actionable if made to a third person rather than to the opposing party. Cf., Dwyer v. Redmond, 103 Conn. 237
(1925); Sallies v. Johnson, 85 Conn. 77 (1911). The nearest analogous cause of action is found in the Restatement of the Law, Torts, 2d, § 623A, Publication of an Injurious Falsehood. The Restatement describes such a tort as follows: CT Page 13669
 "One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to the interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."
The tort of publication of an injurious falsehood, like the similar tort of malicious prosecution of a civil proceeding, see, Prosser and Keeton on Torts, 5th Ed. § 120, Wrongful Civil Proceedings, involves three elements that the plaintiff undertakes to prove in the instant case: 1) a statement of fact to a third person, 2) known by the defendant to be false (or made with reckless disregard of its truth or falsity), and 3) pecuniary loss to the plaintiff. Therefore regardless of how the tort is characterized — fraudulent misrepresentation, publication of an injurious falsehood, or malicious prosecution of a civil action — there are common elements, all of which the plaintiff must prove.
The only question is whether the characterization of the tort creates a different quantum of proof — preponderance of the evidence vs. clear and satisfactory proof. The plaintiff concedes that his cause of action sounds in fraud and concedes that he must prove his case by "clear and satisfactory, or clear, precise and unequivocal" evidence. Kilduffv. Adams, 219 Conn. 314, 327 (1991). In analyzing the evidence, the court finds that even under the lesser quantum of proof — preponderance of the evidence — plaintiff has failed to carry his burden. The plaintiff has failed to prove that such a statement was made, that if made it was substantially false, and that he suffered any damages as a result.
First, there is no direct evidence at all that the defendant or her lawyer said anything to Mr. Belford about when Mr. Banquer had acquired the stored property. Indeed Ms. Steidley did not know when he acquired the property and did not know the date of his bankruptcy filing. There is no evidence that she understood the significance of these dates even had she known them, such that she could have formulated a plan to deprive Mr. Banquer of his property by providing such false information to the trustee. The credible evidence is that her lawyer said to her that the property might be part of the plaintiff's bankruptcy estate and that they should probably let the bankruptcy trustee know about it. Mr. Belford confirmed in his testimony that he was never told that the property was CT Page 13670 owned by the plaintiff pre-petition. Rather he concluded (as does this court) that the plaintiff did not have the wherewithal to have acquired all of this property after the filing of the petition. Although sufficient circumstantial evidence might allow a trier of fact to infer that Mr. Belford's opinion as to the estate's entitlement to the property was formulated only after a statement of fact was made to him about the date of the acquisition of the property, that evidence is either wholly lacking or unconvincing here.
Secondly, even if such a statement had been made, it appears that such a statement would have been substantially true, or at least not substantially false. The two most striking pieces of personal property stored at the defendant's house were 1) the dozens of plastic containers that are shown in the photographs taken by the plaintiff's lawyer and 2) the body of a Jaguar automobile,[3] partly restored and left under a tarpaulin near the garage. Mr. Belford testified that when he took possession of the property he saw that most of what was stored in the plastic containers were small, unopened boxes of auto parts. In a conversation with his lawyer memorialized in a written memorandum, the plaintiff admitted that the Jaguar auto body and the automobile parts were all acquired before the bankruptcy petition was filed.[4] Also stored on the defendant's premises were the water heater, refrigerator/freezer, and the large tank of the power washer, all of which the plaintiff admitted in his testimony were owned by him before he filed his bankruptcy petition. It is clear to the court that even if the defendant made a statement to the trustee that the plaintiff had acquired the items before the petition in bankruptcy was filed, such a statement would have been, in large measure, true.
Finally the plaintiff has failed to prove that he has been injured. The plaintiff's credibility suffers as a result of his outlandish claim that the deprivation of some auto repair manuals and tools has disrupted his ability to file income tax returns, earn a living, and get back on his feet over a period of six years now. Despite the plaintiff's claim that he was prepared to launch a successful auto body repair business, the court finds that the success of such an enterprise is entirely speculative. There is no evidence that the plaintiff ever completed his studies in the field or ever worked in auto body repair except for doing odd jobs. As to his claim that he spent thousands of dollars defending the adversary proceeding brought by the trustee over the personal property, there is no evidence of what if any expenses or fees he paid.
Nor can the court credit the evidence offered by the plaintiff as to the value of the goods lost. The court does not believe that all of the money given to the plaintiff by his parents was given to him between August and November of 1993 nor that all of that money went to buy CT Page 13671 tools. That the plaintiff testified that the value of the tools was twice what he paid, that he paid for them all in cash (when there is evidence that he was using a credit card for many other purchases during the same time), that he offered no names of the vendors nor lists or photos of the types of tools, all of these factors make the plaintiff's testimony not credible as to the value of the lost items. In the absence of credible evidence of the value of the lost items, the court would be left to speculate or guess as to their value, a process that is not allowed. The plaintiff has failed to prove by a preponderance of the evidence the damages he claims.
The court is not without sympathy for the plaintiff. During a period of financial and emotional reversals, to have a zealous bankruptcy trustee institute litigation against the plaintiff, ending in an unsatisfactory manner for all concerned, is certainly unfortunate. But none of this can be laid at the feet of the defendant.
The plaintiff has failed to prove his claim against the defendant. Accordingly the court enters judgment in favor of the defendant and against the plaintiff.
Patty Jenkins Pittman, Judge